Good morning. May it please the court, my name is Matthew Digesti and I'm appearing on behalf of the appellant Helina Snider in this case. And to serve as a brief introduction, Snider is here challenging two district court orders. The first is the order granting Greater Nevada's summary judgment motion. And the second is the order denying Snider's motion for relief from judgment. And to provide the court with a brief road map, I'd like to actually start by discussing the second order and why the court abused its discretion in denying Snider's motion. Snider, after the summary judgment motion was granted, requested that the court give relief from that order. And the main issue on that was that the constructive discharge claim was actually pled in the alternative in the complaint. So we had a federal constructive discharge claim and we had a state constructive discharge claim as well. So the basis for the motion for relief was that the Greater Nevada did not actually move for summary judgment on the state claim. And if you look at Celotex Corporation, the burden is initially on the party moving for summary judgment to move for summary judgment on that claim. And it was our position that they did not do so. They only moved for summary judgment on the federal constructive discharge claim. And so under Celotex Corporation, they did not meet their initial burden of moving to have that claim dismissed. Now, there's a second part to this argument. The district court, of course, has a sua sponsi power to dismiss a claim if it deems necessary without a party moving. But it is Snider's position that under the rules for the sua sponsi power, you need to provide Snider with not only notice but an opportunity to be heard if the court's going to dismiss that claim based upon its sua sponsi powers. Now, the court didn't specifically say it was doing so. Instead, the court said that basically two things. One, we are dismissing this claim because we dismissed both the federal and the state claim in the summary judgment order. And Snider disagrees with that, again, because the initial burden was not met by Greater Nevada in moving to have that claim dismissed. Yeah. Now, if I can interrupt. In my view, you're kind of working around the edges of the case. To me, the centerpiece really is whether or not there was some form of discrimination. Obviously, the discharge is an adverse action. The question is the motivation for it. And you've got some evidence. The one piece of evidence in your favor that strikes me as the most powerful piece of evidence you point to but kind of obliquely, and I want to say it now so that your adversary isn't surprised when I say this. I'm looking at ER 295. I'm on page 56 because it's one of these deals where you've got four deposition pages on a single ER page. This is the deposition testimony of Cheryl Bartels, the assistant to Mr. Gilmore. Mr. Gilmore apparently likes her. It is she who's gone in to try to sort of make peace after that sort of outburst at the beginning, saying, you know, Asian people aren't really confrontational. Maybe you were a little too harsh. And the fact that she didn't speak up, you know, doesn't mean she wasn't hurt. And he responds, yeah, yeah, but I dealt with Japanese people when I was at Wall Street. That's who we're talking about. So she's now giving her deposition. She's told us in the deposition that he encouraged her to apply for a management job. She slips her resume, but it's an old one, into the pile of resumes that he's going to look at to consider for one of these jobs. Okay. He then hands back to her the resumes that he is not considering. That is to say that he has rejected. And I'm now at the bottom of page 56. And was your resume included in the pile of resumes that he wanted to return to Human Resources? Yes, that's correct. In other words, looking at that resume, he has rejected her resume. But the problem is it was an old resume, and she had on it her prior married name, which was Fong. Even though the resume was her resume, and if he'd read the resume, he would have realized that this was the person that he'd encouraged to apply for the job. And at that point, she says, well, hey, wait a minute, this was me, and he gets very embarrassed. That strikes me as the equivalent in the employment context of the tester situation for apartments, where the black guy goes to the apartment and says, I'd like to rent the apartment, and the landlord says, sorry, it's full. The white guy shows up half an hour later with the same, you know, they set them up so that the resumes are equivalent, saying, I'd like to rent the apartment, and the landlord says, oh, yes, I'm happy to rent it to you, da-da-da-da-da. Well, when he thinks her name is Fong, he rejects her. But in fact, the very same person, Cheryl Bartels, as he now knows her, he encouraged her to do it. That strikes me as a smoking gun of a discriminatory intent generally. Now, not specifically with respect to this plaintiff, obviously, but that tells me that this is a person who discriminates on the basis of race. Okay. That evidence strikes me as really very strong evidence in your favor. You didn't really emphasize that part of the exchange, I have to say. Well, if I could build on that, Your Honor. Of course, we're speaking in the context of the national origin discrimination claim. And if you'd like to speak specifically about this particular situation with Bartels, the district court, and this is somewhat of a familiar pattern, but the district court in its order, as far as this situation is concerned, disregarded certain evidence surrounding the situation. And that's point number one. Point number two is that it read some of these facts and actually viewed them in a light, in my opinion, most favorable to Greater Nevada as it partakes to this position. So I'll be more specific. First of all, the district court disregarded the evidence, I think, that he did in fact encourage her to apply for the position. Now, Greater Nevada is going to argue that there's no evidence the position was open or that Gilmore, in fact, encouraged her to do so, but they do so in the context without producing Mr. Gilmore. They're arguing on his behalf when, in fact, they never called him as a witness or took his testimony. So I don't think it's fair that they can do that. But, again, the district court disregarded certain evidence, just like you said. It also, when the exchange took place. The district judge does not recount the portion of the deposition testimony that I just recounted to you. Not in the order, no. Well, let me ask you this, being sensitive to what Judge Fletcher just said. The reality is it's Ms. Snyder who's making the claim here, not Ms. Bartels. And the only evidence that I'm aware of of any direct comment that could conceivably be construed as a national origin claim was the staff meeting where he asked her to slow down because people couldn't understand her. She readily admitted that people didn't understand her when she spoke rapidly in particular. Is there any evidence other than that, the staff meeting incident, that you can cite to me where Ms. Snyder herself was made the object of a discriminatory comment or, so far as you know, discriminatory treatment based on national origin? There is one other piece of direct evidence. It was not directed at Ms. Snyder personally. Okay. Well, that was my concern. There's a number of incidents around this. But on the other hand, you've got this company that's losing tons of money. She's a highly paid person. The response that the government gave under the McDonnell Douglas test, or not the government, the company rather, seemed pretty persuasive to me. I mean, they had to cut back. And the pretext seems to be tied to these incidental little things, but nothing direct except that one point. Am I missing something here? What is the pretext that's been established by Ms. Snyder personally? I don't think, Your Honor, you're missing anything. But I will comment that Gilmore did make the comment to Cheryl Bartels when she said you have to be more sensitive to people of oriental culture. He did say, Why do I have to care or concern about Herlina's feelings? I've dealt with Japanese people on Wall Street in the past. Now, in my opinion, I believe that is direct evidence of national origin discrimination that is directed specifically at Ms. Snyder. That may be some indication of his personal views, and I'm not applauding what he said. I'm simply saying it takes a lot more than that to show national origin. Well, I'll admit that this is not, in my opinion, a slam-dunk direct evidence case of national origin discrimination. But as the Court knows, you can prove national origin discrimination based on a combination of direct evidence, a combination of circumstantial evidence to reach a big-picture story of cumulative evidence of discrimination. What do you do with, and again, this is probably a question to you, but it's also just to highlight to your adversaries when she stands up. I'm looking at the fourth paragraph of Mary Porras's affidavit. Mary Porras says, Shortly after the move to the new building, now this is ER 272, Mr. Gilmore on numerous occasions told me directly that he wanted to get rid of Herlina, that is to say, Ms. Snyder, and wanted to replace her with some guy that he had in mind. Mr. Gilmore never mentioned that Herlina's position would be eliminated or that any restructuring was being contemplated. Mr. Gilmore's intent was to replace Herlina. And, Your Honor, I think that's the point I'm trying to make with this is a big-picture national origin discrimination case. I wish you'd said that instead of making me say it. I apologize. Affidavit. I think the briefs do a good job of laying out the entire picture. And you really have to start from the beginning where he targeted her in that meeting. He expressed his intent to replace her before any restructuring occurred. And then you can fast forward to when he got the restructuring mandate and went ahead and terminated her position. Let's hear from the other side. You're over time. We'll give you a minute to respond. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. I'm Susan Heaney Hilden representing Greater Nevada. I will go back and address your question, Your Honor. Regarding the comment to or the issue with Cheryl Bartels and the resume, she testified that she had put an old resume in, one that presumably did not reflect any of her current experience. He doesn't know who this is, and he put it back in the pile. He learned that it was It's unclear how old this is in terms of how much experience he had. Okay. Had he read it, he almost, I think it's, well, I don't see it. But it's a pretty good guess that he actually, had he read the resume, he might have recognized that it was the person working in his outer office.  And maybe that is somewhat vague in the record. However, what is clear in the record is that Cheryl Bartels testified that he promoted, Gilmore promoted her to the position of business operations manager. This is after the incident with the resume. He promoted her to the position of business operations manager. He bought her a plaque to hang outside her door that said business operations manager, and he gave her the employee of the year award. This is on ER 436, page 39. And this is the same employee that he wouldn't even look at when he thought her name was false. But you're assuming that based on an old resume that was submitted. Can we kind of cut to the chase here? Following up on Judge Fletcher's point, let's just assume for a moment that the manager here is a real dolt, and let's assume even for a moment he's a racist. Given the facts of this case, what was really done with Ms. Snyder, does the plaintiff still make out a case? No. The plaintiff does not have evidence of pretext for discrimination due to the undisputed evidence regarding the reasons for the position elimination. When the employer came back on the second prong of McDonald, there was no contra evidence at all about any of that, was there? No, there was no evidence. So under McDonald-Douglas, how do we weigh that in terms of they come back and they say there's this pretext, and you've got this little fire, a little smoke around here and there. How does that weigh in a summary judgment situation? Well, it doesn't here because none of the things they raise go to the reasons for the position elimination. They don't establish that the reasons given for the position elimination were internally inconsistent or otherwise unbelievable. That's what the pretext has to establish, and they have all these unrelated scenarios. But the trick is the following. It's unquestioned. I mean, the other side does not dispute that the company was in trouble, the company needed to reduce costs, and the company made, and I'm quite willing to assume this is true, a general decision, quite irrespective of racial discrimination, that they had to reduce costs by reducing force. That's easy. And do you agree with that? I think we all agree with that. Yes. The question is, who is chosen to bear the burden of being laid off? And it turns out one of the people is Ms. Snyder. We have evidence here from this affidavit that Gilmore, for whatever reason, has targeted her from the beginning that he wants to get rid of her. And we also have evidence with respect to that resume thing from which a jury could infer that all he has to do is see the name Fong and game's over, he's not going to hire the person. Is that enough to get to the jury? That's the question. No. Not in this case. I guess it was obvious that that would be my response. But look, the situation, thanks for the softball. But in this case, she was the second most highly paid person. Well, first of all, the CEO, CEO Taylor, testified that the idea in eliminating positions was targeted at three departments, loan processing, underwriting, and secondary marketing. That's it. That's all that was being considered. This is only a 29-person company as of May 2006. So this isn't a scenario where you have 500 people and the plaintiff is targeted. There's 29 people. There's three departments being looked at. Sales isn't being looked at because that's the only thing generating money at this point. She's the second most highly paid person other than the CEO. The first most highly paid person other than the CEO and Gary Gilmore. The first most highly paid person, Mary Porras, who was in underwriting, they testified that they were looking at eliminating her position, but she went out on leave and never returned. And they didn't replace her. Gilmore himself was removed eventually, right? Well, Gilmore himself resigned later. He left the company later. Is it possible that he was encouraged to resign? I think maybe so. But there's nothing establishing in the record that there was impropriety or anything of that nature that had to do with anything to do with this case as far as Gilmore's departure. But she was the ---- What do we do with the following in the record? She says that she was offered a commission-based position, and she says, you know, I'm not good at sales, and I couldn't take the position. On the other hand, if they had offered me the position with a base salary, it turns out the base salary at which they hire this young guy several months later, I would have taken it. So what do we make of the position of the argument that she would have actually given them the economy that they achieved by hiring her and hiring somebody else for the same position at a lower level if they just said, listen, will you take a pay cut? What do we do with that? Well, that doesn't establish that there was pretext or discrimination. I mean, basically ---- Is that relevant evidence at all? I don't think it is relevant evidence at all. And of course she's going to say she would take the position when it's after the fact and she hadn't gotten another job. But the reality is, and I mean, this is somewhat contradictory. Do we know she hadn't gotten another job? We do because she testified later that the CEO called her. This is after Gilmore left, after this other guy suddenly resigned and he's left with nobody. He calls her because he knows, he's heard that she had been doing a family business and it didn't work out. So he called her and asked her to come back, and she said no. Yeah, that's right. So it's very easy to say I would have come back, but I think that's irrelevant to the scenario. I mean, the reality is it's quite common. I'm sorry. She didn't say I want to come back. She said if I had been offered an opportunity to continue, not be fired and come back, but an opportunity to continue at the lower, she said I would have taken it. Now, may or may not be true, but that's what she says. That's disputed, I would argue, by the fact that she later, after not having a job for nine months, didn't come back when offered. And when she was told that Derry Gilmore had left. That was a time when the alleged wrongdoer had left and she didn't take it. I wasn't twice shy. I don't know. I guess what bothers me is we're at the summary judgment stage. There's little doubt in my mind that in the end, Ms. Snyder is not likely to be successful in a case. But at a summary judgment stage, when you've got these little fires around, can you at least raise this issue of pretext under the burden concept? Don't we need to send this back to the district court so there can be a trial and a jury can figure this out? Absolutely not. Not in this case. Because they're not establishing pretext. The things that they raise don't establish that the reason given for the position elimination is internally inconsistent or otherwise unbelievable. They're nothing to do with the decision. Well, but if you go back to the points that were made earlier, here you have somebody who says, I want to get rid of this person. I want to get rid of Snyder. Targeting her, basically. Ultimately, that happens. There are comments made about the Bartel and the Fong issue and so on. There's a little bit of smoke, a little bit here and there that suggests that there was a racial or national origin basis for the ultimate decision. Yes, there were business reasons. Yes, that will probably prevail. But I guess I'm concerned about where we are in the proceeding at this point. I still go back to none of those things have to do with the position elimination. And CEO Taylor clearly testified that he directed the manner in which positions were to be selected. He directed them to look at employee salaries and what they could do without. And what they were looking at were the employees with the two highest salaries besides the CEO. But didn't Gilmour, he was the one that made the selection of who went, right? He came back and said she's the second highest. Yeah, and CEO Taylor approved it because there was an assistant that made $24,000 less that could fulfill the same duties. But if there was a racial animus behind the position decision, that's where we have a problem, is it not? That's where you have an attempt to establish pretext. I just don't think that there is anything sufficient to establish a racial animus. What you have are these unrelated things. You have this incident with the phone resume which really tells you nothing, especially when all she's saying is he put it in a pile to go back to HR. Well, if that's true, he doesn't need a resume. She already works for him. Ultimately, though, our decision, I think, is that we're going to have to weigh whether these little spires in the aggregate provide enough of a pretext argument that it needs to go back to the jury. Do you agree with that? I agree that that is true, but I may change. I know you don't want us to do this. Yeah, I agree that you need to weigh those. You don't want us to turn this over, but that is, in fact, what we're dealing with, right? That is. That is. And I believe the district court correctly concluded that these things do not establish direct or indirect evidence of pretext. And what they've done is they've picked out a bunch of unrelated incidents that largely have nothing to do with the plaintiff in this case. And they're using them. And they're saying he was targeting her and all these things. But I go back to this was a 29-person company. It's not like she was targeted out of 500 people. She was the next most highly paid person after Mary Porras compared to the CEO and Gary Gilmore. It's kind of a no-brainer that those are the positions that would be eliminated. So I just don't think that you get to pretext in this case. And to address your argument about or your question about Gilmore saying, I'm going to replace her with someone from the East Coast. Well, he didn't. He didn't replace her with some guy he knew from the East Coast. That was the testimony that she said. And even if he wanted to replace her, that doesn't show that it's due to discrimination. Often people come in and they want to bring in somebody that they had worked with. He ended up replacing her with a young man who he met through a mutual friend. But that wasn't. And he didn't work out either. But that was not. That position only came about because the assistant, whose name was Gianni Fonseca, resigned. That was four months later. When she resigned, he was hired at her salary with no assistant. That was not a replacement of the plaintiff. That was a replacement of the assistant that resigned four months later. And we know that because he was paid $24,000 less and didn't have an assistant like the plaintiff had had or the appellant in this case. Okay. Thank you. Thank you. I think you've used up all your time, but we'll give you a minute to respond. Thank you. I'd just like to make one quick point. One, Cheryl Bartels was never promoted to operations manager. If you look in the record, page 436. Does that help you or hurt you? Excuse me? Does that help you or hurt you? I think it helps because it shows that Mr. Gilmour did have a Chinese bias towards her. And had he promoted her to operations manager, it somewhat defeats that argument. I don't believe it does. But regardless, the company even disputed her promotion before the Nevada Rehabilitation Department when they were talking about unemployment. So there's no evidence in the record that she was actually promoted or received an Employee of the Year Award. And I'll try to briefly state, again, this is a big-picture national origin discrimination claim. You cannot compartmentalize certain pieces of evidence and say this isn't enough or that's not enough. It was all about money to Greater Nevada and to possibly Robert Taylor. But our focus is on the intent of Derry Gilmour, which can be imputed to the company based upon theories of agency. And so if you start at the beginning, he intended to replace this person. You look at the Fong incident. You look at the Bartels incident. You look at the farce of restructuring. You look at the fact that he took non-Chinese employees on a junket during restructuring at a cost of $14,000 and 27 percent of her latest salary. And then you look at the facts, and I have to skip over a few things. Well, you're already 15 seconds into our time. Well, if I may finish, Your Honor. One sentence. Okay. Let's fast-forward to the fact that this position was recreated by Derry Gilmour, and it was filled by a person of non-Chinese descent. Longer sentence. Thank you. Thank both sides for your arguments. The case of Snyder v. Greater Nevada is now submitted for decision.
judges: Hug, Fletcher W. , Smith M.